## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE FARM MUT. AUTO. INS. CO., *et al.*, | |
| v. | Civil Action No. CCB-18-1279 |
| CAREFREE LAND CHIROPRACTIC, *et al.* | |

### MEMORANDUM

This suit involves allegations that the defendants, several Carefree Chiropractic corporate entities and associated doctors (collectively, "Carefree"), submitted hundreds of fraudulent insurance claims to the plaintiffs, State Farm Mutual Automobile Insurance Co. and State Farm Fire and Casualty Co. (together, "State Farm"). State Farm generally alleges that Carefree provided "protocol treatment," to its patients by documenting the same maladies, treatment plans, and results for each, rather than providing individualized treatment, over the course of approximately a decade from 2006 to 2016. *See* Am. Comp., ECF 64.

Before the court is Carefree's motion for summary judgment arguing that State Farm's claims are barred by the statute of limitations, among other things. Mot. for Summ. J., ECF 121. The motion has been fully briefed and no oral argument is necessary. *See* Local Rule 105.6. After reviewing the arguments and the evidence, the court will deny Carefree's motion for summary judgment.

### BACKGROUND

State Farm's investigations into Carefree's claim submissions lie at the heart of Carefree's summary judgment arguments. The court therefore begins by laying out the administrative structure of State Farm's investigative teams before describing the investigations of Carefree

1

undertaken by State Farm in 2013 and 2015. The court then turns to a review of this litigation and the arguments at issue.

## I. State Farm's Investigative Structure

*The Complex Unit*. In 2012, State Farm formed the "Complex Unit" within its personal injury protection ("PIP") claims handling section. Defs.' Mem. in Supp. of Mot. for Summ. J. at 3, ECF 121-2 ("Mot.") (citing S. Bowen Corporate Designee Dep. at 9:19-20, ECF 121-3 ("Bowen Dep.")). The Complex Unit's task was to review claims for billing issues or discrepancies between bills and related medical records. Bowen Dep. at 10:20-22, 13:16-21. Whether the Complex Unit reviewed groups of claims to detect patterns related to protocol treatment is a matter of dispute. *See* Pls.' Opp'n to Mot. for Summ. J. at 12-13, ECF 125-1 ("Opp'n"); Mot. at 5-6; Bowen Dep. at 14. The Unit consisted of manager Steve Vial, adjusters Scott Bowen, Chris Miler, and Eric Pritt, client representative Megan Reader, and claims processor Sara Stephen. Bowen Dep. at 15:8-14. From 2012 until it disbanded in 2014, the Complex Unit investigated claims submitted by several medical services providers to determine whether they should be paid or referred for further investigation. Bowen Dep. at 27:15-18, 192:4-6.

*The Special Investigation Unit*. The Special Investigation Unit ("SIU") is one of State Farm's fraud investigation units. S. Vial Dep. at 20:14-17, ECF 121-11 ("Vial Dep."). The SIU investigates questionable or suspicious *individual* claims—as opposed to groups of claims—to determine whether any further investigation is required before paying the claim. *Id.*; D. Walton Dep. at 11:15-18, ECF 121-12 ("Walton Dep.").

*The Multi-Claim Investigation Unit*. The Multi-Claim Investigation Unit ("MCIU") is the other of State Farm's fraud investigation units, and it investigates multiple claims with a common

thread, often involving the same people or the same provider. Walton Dep. at 11:15-18, 12:4-5. A formal MCIU investigation involving "many files . . . [with] the same theme" is called a "Project." *Id.* at 11:20-21. The parties agree that "issues such as protocol treatment" fall within MCIU's ambit. Bowen Dep. at 116:14-17.

The parties disagree about the overlap between the work of the Complex Unit and the MCIU—Carefree effectively takes the position that the stages of State Farm's investigation should be construed as a single inquiry. Carefree contends that, at least with regard to the investigation into Carefree, "[t]he Complex Medical Unit *and* its specialized Fraud investigation unit [i.e. the MCIU], work[ed] in constant coordination with each other" and that both investigated "patterns and similarities across multiple claims" or records. Mot. at 6, 9. Fundamentally, Carefree's position is that the units "were *together* looking for anything within and across the Carefree Land records and claims that was suspicious, including specifically the possibility of protocol treatment." *Id.* at 9. Carefree points to email correspondence between Vial and MCIU's head, Diane Walton, to show the units' coordination. Emails from S. Vial to D. Walton, ECF 121-9; Emails between S. Vial & D. Walton, ECF 121-10. Carefree also argues that deposition testimony from Vial and Walton show that they were coordinating on the Carefree investigation. Vial stated that he did "share information" with Walton and the MCIU, but explained that it was part of an effort not "to trip over each other. They had their role. We had ours." Vial Dep. at 74:3-6. State Farm, on the other hand, argues that "[t]he issues analyzed by the complex unit differed from issues the MCIU would have examined." Opp'n at 12. According to State Farm, the Complex Unit's investigation focused on "potential overbilling issues" while the MCIU "look[ed] at a provider for other identified issues such as protocol treatment . . ." Bowen Dep. at 116:9-17.

## II. State Farm's 2013 Investigation

When it was formed in 2012, the Complex Unit's purpose was to "take . . . a more in depth look at providers whose billing may have been outside the state average." Bowen Dep. at 10:20-22. The Complex Unit undertook a statistical analysis of billing from providers across the state of Maryland to identify these outliers and determined that Carefree's billing was above the state average. *Id.* at 19:11-13, 20:12-13, 98-99. Based on Carefree's billing, it was selected for further investigation by the Complex Unit in early February of 2013. *Id.* at 20:13-16, 22:6-7.

At this time, Miler drafted a memorandum entitled "Provider Recaps" (the "Miler Memo") outlining the "issues/concerns" and "planned defenses" relating to Carefree. Provider Recaps Mem. at 4-6, ECF 121-7. In the Memo, Miler primarily identified potential problems relating to non-individualized treatment, including that Carefree's "[m]edical records appear to be vague and suggest the presence of protocol treatment," "[m]edical records suggest that the treatment plans remain the same from patient to patient," and "[d]ischarge reports appear to be very similar from patient to patient." *Id.* at 4-5. Miler also stated "[t]here appears to be strong correlation between Carefree Land Chiropractic and the Asian community." *Id.* at 5. Miler's recommended defenses against paying out fraudulent claims included getting "[d]etailed recorded statements from all parties as to the facts . . . [and] the type of treatment rendered," posing specific questions to the medical providers, gathering information about the vehicle accident which precipitated the medical services, "pos[ing] questions to the provider regarding perceived deficiencies in record keeping," and "refer[ring] files, as necessary, to the SIU/MCIU to review any perceived suspicious activity." *Id.* at 5-6. Notwithstanding his observations, as of February 14, 2013, Miler stated that he "ha[d] not encountered any claims from this provider that would benefit from an investigation." *Id.* at 6.

In March and April of 2013, Complex Unit adjusters began reviewing individual claims submitted by Carefree. Bowen Dep. at 18:7-12, 25:4-13. In total, the Complex Unit looked at 22 of Carefree's claims; Miler reviewed 5 and Bowen reviewed 17. *Id.* at 16:11-13, 17:2-4. In their reviews, Miler and Bowen "look[ed] at the bills to see if they coincide with what is reported in the medical records." *Id.* at 13:14-21. The Complex Unit's review of individual claims continued throughout 2013. *Id.* at 26:17-27:6. On December 6, 2013, Bowen referred one of the claims he reviewed, 20-2V52-144, to the SIU for a fraud investigation. 20-2V52-144 Auto Claim File at 4, ECF 121-18 ("Claim File"). According to Bowen's referral, Carefree billed for an ultrasound but the patient stated in an interview that no ultrasound was performed. *Id.* at 4-5.

SIU accepted Bowen's referral of claim 20-2V52-144, and SIU investigator Tammy Cotton conducted her own investigation into the claim and determined, based on a new interview with the patient, that "[i]t's very difficult to prove whether a treatment was [received] or not" but based on the patient's representations that "a wand type item and jelly [was] placed on his shoulders" and a medical colleague's opinion "that this type of treatment is consistent [with Claimant's] injuries, I feel that the injury claim should be honored." *Id.* at 3. The claim was paid on January 13, 2014. *Id.* at 2.

In addition to reviewing the individual claim, Cotton also contacted MCIU project screener Becky Burwell on December 13, 2013, asking whether Carefree was under investigation by the MCIU. Email from T. Cotton to B. Burwell re: Carefree Project, ECF 121-19. Burwell stated that Carefree was not under investigation at that time, but sent the information along to an analyst to review Carefree as a potential Project. *Id.* MCIU screener Carla Scouten and analyst Derrick Brown then screened Carefree as a potential MCIU Project between December 17 and December 27, 2013. Walton Dep. at 59:7-60:16. Scouten identified two issues of concern for her review of

5

Carefree: "billing for services not rendered," which specifically related to claim 20-2V52-144; and "overbilling, unbundling & providing services that were not conducive to the injuries." 2013 Carefree Screening Report at 7, ECF 121-21. Based on a review of fifteen of Carefree's 422 total claims, Scouten determined that there was a "low" likelihood of prevailing in litigation against Carefree and recommended "return[ing] [Carefree] to [the] Potential Projects Database," meaning that it would not proceed as a Project. *Id.* at 5, 9; Bowen Dep. at 138:5-7. Despite this recommendation, Scouten also found that "[t]reatment at both locations appears to be the same for each patient," and enumerated six patient numbers. 2013 Carefree Screening Report at 7. Scouten did not further elaborate on her findings regarding similar treatment across multiple patients. *Id.*

The parties dispute whether Scouten screened Carefree for protocol treatment specifically. State Farm points to the two issues of concern, which do not include protocol treatment, *see* Bowen Dep. at 159:10-14, while Carefree argues that Scouten described similar treatment for patients at Carefree in her investigation findings and that protocol treatment was an issue commonly reviewed in MCIU screenings, *see* Walton Dep. at 14:25-15:12. Bowen concedes that Scouten's screening "may have touched on a component of a protocol treatment, but it doesn't appear that she did a large scale review into protocol treatment based on the fact that it was not identified in the issues of concern." Bowen Dep. at 174:18-22. The parties do agree, however, that if a Project had been opened in late 2013 or early 2014 reviewing Carefree's 422 claims for evidence of protocol treatment, "the information [necessary to determine the presence of protocol treatment] would have been available." *Id.* at 158:24-159:7.

After Scouten's screening, Carefree was raised to the MCIU once more in January of 2014, again as the result of a referral from Bowen. Email from T. Griesacker to MCIU Team, ECF 121-

6

20. The second referral was also based in part on claim 20-2V52-144. *Id.* Derrick Brown, the analyst who had screened Carefree the month before, responded that Carefree had already been reviewed and did not pass screening to become a Project, but stated that Scouten would review the new information to determine if it changed her analysis. *Id.* It apparently did not. The MCIU did not open a Project regarding Carefree based on the 2013 screening, and the Complex Unit ceased its review of Carefree when it was disbanded in early 2014. Bowen Dep. at 12:15-13:6.

### III. State Farm's 2015 Investigation

A little over a year later, in July of 2015, State Farm received an anonymous tip from the National Insurance Crime Bureau ("NICB") regarding "alleged improprieties" by Carefree. Email re: NICB Tip, ECF 121-24 ("NICB Tip Email"). The tip was referred to the MCIU, and Bowen, now an MCIU claim specialist, was assigned to conduct the review. Email from M. Incollingo to S. Bowen re: NICB Tip, ECF 121-25; Pls.' Resps. to Interrogs. at 4, ECF 121-17. Bowen, who stated that he recalled his prior investigation of Carefree, again referred Carefree for screening as a potential Project. Email from K. MacElroy to S. Bowen re: Carefree, ECF 121-26; Bowen Dep. at 186:8-16.

In the 2015 screening, the "Primary Potential Issue of Concern" was identified as "necessity," which Bowen described as "a term that we use to encompass protocol/predetermined treatment." 2015 Carefree Screening Report at 7, ECF 121-28; Bowen Dep. at 173:18-19. The screening was informed by Bowen's prior experience with Carefree, and the MCIU screener explicitly noted that Bowen "indicated he noticed Protocol treatment" in the past. 2015 Carefree Screening Report at 16. The screening involved a review of twenty-five out of the 517 claims submitted by Carefree at the time, 2015 Carefree Screening Report at 24; MCIU Project Recommendation at 2, ECF 121-29, and this time the screener determined that there was a

"medium" likelihood of prevailing in litigation and, on October 8, 2015, recommended that a Project be opened, 2015 Carefree Screening Report at 7, 19; MCIU Project Recommendation at 2. The Carefree Project was opened on October 19, 2015, Carefree Project Activity Log at 2, ECF 121-30, with a focus on "necessity," MCIU Project Recommendation at 4. From that point on, State Farm's investigation of Carefree proceeded as an MCIU Project until the filing of this lawsuit.

## IV. Procedural History

State Farm filed its original complaint on May 1, 2018, alleging that it had been defrauded by Carefree's submission of claims that were inflated by protocol treatment. Compl., ECF 1. State Farm specifically brought causes of action for fraud and unjust enrichment, and for a declaratory judgment that it had no duty to reimburse any outstanding claims submitted prior to the commencement of the action, or for any claims submitted subsequent to the filing of the action which include any false or fraudulent information. *Id.* ¶¶ 75-90.

Carefree moved to dismiss the complaint, and the court granted dismissal, holding that State Farm's allegations were insufficiently specific to satisfy Federal Rules of Civil Procedure 8(a)(2) and 9(b). *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic ("Carefree I")*, 2018 WL 6514797, at *3 (D. Md. Dec. 11, 2018). The court reasoned that State Farm's "fail[ure] to identify even one patient" or "even one specific document or record" meant that the complaint "fail[ed] to provide the level of particularity required by *Iqbal* and Rule 8(a)(2) [as well as] Rule 9(b)." *Id.*

After the complaint was dismissed, State Farm moved for reconsideration or, in the alternative, for the dismissal to be vacated and for permission for file an amended complaint. *State*

*Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic ("Carefree II")*, 2019 WL 4722675, at *1 (D. Md. Sept. 25, 2019). The court granted the motion to file an amended complaint, reasoning that State Farm's proposed amended complaint, which included an exhibit enumerating specific patients treated by Carefree, "sufficiently alleges fraud" by identifying "what records State Farm alleges to be fraudulent, and why it alleges them to be fraudulent." *Id.* at *5. The amended complaint, which was docketed on September 25, 2019, asserts the same causes of action against Carefree as the original complaint. Am. Compl. ¶¶ 74-91, ECF 64.

Carefree then moved to dismiss the amended complaint, arguing that State Farm's claims were barred by the statute of limitations. *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic ("Carefree III")*, 2020 WL 5526585, at *1 (D. Md. Sept. 15, 2020). The court denied that motion, finding that State Farm had pled that it could not have discovered Carefree's alleged fraud more than three years before it filed its complaint, and that the claims therefore survived a motion to dismiss because of Maryland's discovery rule. *Id.* at *3-4.

**V. Carefree's Motion for Summary Judgment**

Carefree revives its statute of limitations arguments in its present motion for summary judgment, contending that State Farm filed its complaint after the three-year statute of limitations had run on its claims. Mot. at 25. Carefree argues that the date the Amended Complaint was filed, September 25, 2019, is the relevant date for measuring compliance with the statute of limitations. *Id.* at 29-30. And, according to Carefree, the evidence now demonstrates that State Farm had inquiry notice of the alleged fraud at the time of its 2013 investigation, almost six years before the amended complaint was filed (and over four years before the original complaint was filed). *Id.* at 26-29. Carefree also asserts that any claims that survive its statute of limitations argument are barred by the voluntary payment doctrine, and that both State Farm's declaratory judgment cause

of action regarding pending claims and the rest of its claims of fraud lack any evidentiary support. *Id.* at 30-35.

State Farm responds that the relevant filing date is that of the original complaint, May 1, 2018, because the amended complaint relates back to the filing of the original complaint. Opp'n at 19-23. Based on this date, State Farm argues that its claims are timely because it did not discover Carefree's fraud until the 2015 investigation, which began at the earliest in July of 2015, less than three years before State Farm filed its original complaint. *Id.* at 23-28. At the very least, State Farm contends that reasonable minds could differ as to whether it should have discovered the fraud in its 2013 investigation, and that summary judgment on the discovery rule would therefore be inappropriate. *Id.* at 28. State Farm also argues that the voluntary payment doctrine does not apply in this case, and that Carefree's evidentiary arguments misstate relevant testimony. *Id.* at 30-34.

Additionally, Carefree's reply and State Farm's proposed sur-reply dispute whether State Farm's complaint can include claims that were submitted after the amended complaint was filed. *See* Reply in Supp. of Mot., ECF 128 ("Reply"); Sur-Reply in Opp'n to Mot., ECF 129-2 ("Sur-Reply").

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.*

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007). Generally, "when there is a close question and 'reasonable minds could differ' when weighing the facts against the law, then summary judgment is inappropriate." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)). This is especially true in cases involving Maryland's discovery rule, where, if "there is any genuine dispute of material fact as to when the [claimants] possessed that degree of knowledge [of the circumstances which would cause a reasonable person in the position of the claimants to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged cause of action], the issue is one for the trier of fact to resolve." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 73 (2006) (quoting *Bank of New York v. Sheff*, 382 Md. 235, 244 (2004)) (alterations in original).

## ANALYSIS

To better focus its analysis, the court begins by determining the date on which the statute of limitations was stopped by State Farm's initiation of litigation. Then, the court will analyze whether State Farm was on inquiry notice of the alleged fraud more than three years before that date. Finally, the court will resolve Carefree's arguments as to the surviving claims.

### I. Relation Back

"An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct . . . set out . . . in the original

pleading." Fed. R. Civ. P. 15(c)(1)(B). No one disputes that the amended complaint merely added greater detail to the same claims alleged in the original complaint. Carefree instead argues for an apparent exception to the relation back rule: "[a] suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed." Mot. at 29 (citing *Hawkins v. Hairston*, No. JKB-12-cv-1366, 2012 WL 5503839, at *2 (D. Md. Nov. 8, 2012)). According to Carefree, the original complaint became meaningless when it was dismissed on December 11, 2018, and the amended complaint filed on September 25, 2019, is therefore the first filing that could stop the statute of limitations clock. *Id.*

Neither *Hawkins* nor the Seventh Circuit case it cites, *Elmore v. Henderson*, 227 F.3d 1009 (7th Cir. 2000), stands for Carefree's proposition. Both cases dealt with a plaintiff who had filed *two separate lawsuits*, the first one timely, the second not. *Hawkins*, 2012 WL 5503839, at *1-2 (first lawsuit filed within 90 days of right to sue letter dismissed for failure to effectuate service, second lawsuit filed outside of 90-day window untimely); *Elmore*, 227 F.3d at 1010-11 (first lawsuit filed within 90 days of denial of administrative complaint dismissed for misjoinder, second lawsuit filed outside of 90-day window untimely). Here, in contrast, the *original* lawsuit was reopened to permit State Farm to amend its complaint. *See* Order, ECF 63.

The law in this circuit is clear that, to permit a post-judgment amendment, the district court must vacate the judgment. *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc). The court did just that. *See* Order, ECF 63. At that point, then, the original complaint was no longer dismissed. State Farm's post-judgment amended complaint amended a live original complaint, and the amendments will relate back to the claims in the first complaint if they "ar[i]se out of the conduct" described therein. Fed. R. Civ. P. 15(c)(1)(B); *cf. United States v. Anderson*, 627 F.

App'x 238, 239 (4th Cir. 2015) (per curiam). And everyone agrees that they do. The effective date of State Farm's claims for statute of limitations purposes is therefore May 1, 2018.

## II. Timeliness

As the parties agree, State Farm's claims are subject to a three-year statute of limitations. Mot. at 25; Opp'n at 8; *Carefree III*, 2020 WL 5526585, at *3; Md. Code Ann., Cts. & Jud. Proc. § 5-101. Therefore, State Farm's causes of action to recover for claims that Carefree submitted before May 1, 2015, are barred unless an exception applies and tolls the statute of limitations until some date after May 1, 2015. The parties join issue over two possible exceptions: (1) Maryland's discovery doctrine; and (2) the doctrine of fraudulent concealment.

Maryland's discovery rule provides that a "cause of action accrues when the claimant in fact knows or reasonably should have known of the wrong." *Carefree III*, 2020 WL 5526585, at *3 (quoting *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 444 (2000)). Application of the discovery rule entails a two-pronged inquiry. First, the court must determine whether there was "sufficient[] . . . actual knowledge to put the claimant on inquiry notice." *Georgia-Pacific Corp.*, 394 Md. at 89 (quoting *Benjamin v. Union Carbide Corp.*, 162 Md. App. 173, 193-94 (2005)). Actual notice can be express or implied: "express knowledge is direct, whether written or oral, from sources 'cognizant of the fact[s],'" *id.* (quoting *Poffenberger v. Risser*, 290 Md. 631, 636-37 (1981)), while implied knowledge is that which is "sufficient to prompt a reasonable person to inquire further," *id.* (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 447 (1988)). Second, if the claimant has sufficient knowledge, the court asks whether "the knowledge that would have resulted from a reasonable investigation" is "sufficient[]," or, in other words, whether "a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing." *Id.* at 90 (quoting *Union Carbide Corp.*, 162 Md. App. at 193). Simply, put "a

13

plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" *Pennwalt*, 314 Md. at 448-49 (quoting *O'Hara v. Kovens*, 305 Md. 280, 302 (1986)).

The discovery rule inquiry necessarily involves an analysis of several stages of evidentiary sufficiency, each of which informs the next. First, a court examines how much evidence was available to the claimant and how convincing it was before the claimant undertook any investigation. That was the issue that precluded summary judgment in *O'Hara*, in which the Maryland Court of Appeals reasoned that "it [was] at least debatable" that the evidence available would have supported "awareness of a possibility, to a degree warranting further investigation," that fraud had occurred. 305 Md. at 304; *see also Poffenberger*, 290 Md. at 637-38. If there was sufficient evidence to compel an investigation, the question of what constitutes a "reasonabl[y] diligent" investigation will necessarily be informed by the evidence that was available before the investigation. Such was partially the case in *Baysinger v. Schmid Prods. Co.*, where the Maryland Court of Appeals concluded that, although the plaintiff had conducted a brief investigation and did not discover the tort, the suspicions that motivated the investigation were not based on concrete evidence, and therefore the question of "[w]hether a reasonably prudent person should then have undertaken a further investigation is a matter about which reasonable minds could differ, and it was therefore inappropriate for resolution by summary judgment." 307 Md. 361, 367-68 (1986). Finally, based on the level of diligence the factfinder determines was required, there remains the issue of whether that investigation would have uncovered evidence of wrongdoing. *See Pierce v.*

*Johns-Manville Sales Corp.*, 296 Md. 656, 663-69 (1983).

Because State Farm's second investigation post-dated May 1, 2015, all of State Farm's claims are timely if it could not have reasonably discovered the alleged fraud until that investigation. And the evidence is clear that State Farm did investigate Carefree for fraud in 2013 and did not discover evidence of widespread protocol treatment. So the question is whether State Farm's unsuccessful investigation was reasonable based on the evidence that precipitated it, or if it should have conducted a more thorough investigation to uncover the evidence that was undisputedly available at the time.

Construing the evidence in the light most favorable to State Farm and keeping in mind that the court's role is not to "weigh the evidence or make credibility determinations," *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)), the information that triggered the 2013 investigation did not unquestionably compel State Farm to undertake additional investigation into protocol treatment. Instead, the evidence shows that, while reviewing individual claims submitted by Carefree as part of an investigation into higher-than-average bills, Bowen referred for further investigation a single claim that he believed included a bill for an ultrasound examination that had not actually occurred. *See* Claim File at 4-5. The MCIU screening that followed appears to have rationally been focused on "billing for services not rendered," and "overbilling, unbundling & providing services that were not conducive to the injuries." 2013 Carefree Screening Report at 7. There is a genuine dispute of fact about whether the 2013 screening considered the possibility of protocol treatment as a reason for opening a Project. Scouten did not recommend Carefree for a Project after her screening, and the claim Bowen referred was determined to be sufficiently legitimate to merit payment. Although there is undeniably (significant) evidence to support

Carefree's position that the 2013 Screening may have considered protocol treatment issues and that State Farm investigators in 2013 were at least contemplating the possibility that Carefree was conducting protocol treatment, the evidence is not so one-sided as to compel the conclusion as a matter of law that State Farm should have investigated possible protocol treatment more thoroughly.

This conclusion finds support in Maryland courts' application of the discovery rule in the summary judgment context. In *Baysinger*, for example, when the plaintiff's initial investigation into the cause of her illness, acute peritonitis with bilateral tubo-ovarian abscesses, unearthed no evidence of wrongdoing, she abandoned the search. 307 Md. at 367-68. Mrs. Baysinger's inquiry into potential wrongdoing was not random; her symptoms began just a few months after a healthcare provider had inserted an intrauterine contraceptive device manufactured by the defendant. *Id.* at 363. Indeed, she asked her doctor directly "whether the coil was responsible," to which he replied that he "could not state the coil was responsible." *Id.* The trial court granted summary judgment, reasoning that "[o]bviously, Mrs. Baysinger, after having had a recently implanted device removed in November, 1979, as treatment for her abdominal distress followed by hospitalization in December, 1979, with similar symptoms and her resulting inquiries as to the cause of her distress, was, or should have reasonably been aware that she 'might have been wronged.'" *Id.* at 365. The Court of Appeals reversed, reasoning that her brief investigation may have been reasonably diligent even though she failed to discover the alleged tort. *Id.* at 367. Construing the facts in Mrs. Baysinger's favor, the court determined that, after her initial inquiry did not produce any leads, "while the record indicates that Mrs. Baysinger entertained various suspicions concerning the cause of her illness, there is no evidence that she then suspected, or

reasonably should have suspected, wrongdoing on the part of anyone." *Id.*

On the other hand, in *Lumsden*, the Court of Appeals affirmed a grant of summary judgment. 358 Md. 435. The plaintiffs were injured when their driveways began to "peel[] and scal[e]" after the region was hit by an ice storm and they hired a company to apply de-icing chemicals (although the defect was ultimately traced to the company that had poured the driveways). *Id.* at 437-38. The court reasoned that "petitioners knew immediately upon seeing the damage done to their driveways that a defect existed for which someone was responsible." *Id.* at 449. Distinguishing the case from *Baysinger*, the court explained that "the hidden cause of Mrs. Baysinger's condition created a factual question of whether a reasonably prudent person in her situation would have conducted an immediate, thorough investigation. In this case, the harm to petitioners was much more apparent, enough so that a reasonably prudent person would have begun investigating the cause of the harm." *Id.* at 449.

On this sliding scale, this case is closer to *Baysinger* than *Lumsden*. Here, the evidence of wrongdoing at the time of the 2013 investigation was simply that Carefree's billing was above average and that Bowen believed that a single claim may have involved treatment that was not actually provided. State Farm inquired into those issues, found its leading theories of fraud wanting, and thereafter abandoned its scrutiny of Carefree until it received the NICB tip. It is certainly arguable that State Farm should have taken a closer look at all possible types of fraud, especially considering the rumblings of protocol treatment that permeated its inquiries into Carefree, but a reasonable finder of fact could conclude that State Farm conducted a diligent inquiry based on the evidence in 2013 and understandably failed to discover evidence of the fraud that it alleges in this case.

Moreover, Carefree's argument that the 2013 screening was "exactly the same" as the 2015

screening is wrong on the facts. Mot. at 27. The 2013 investigation reviewed fifteen claims, while the 2015 investigation involved a closer look at additional files. 2013 Carefree Screening Report at 11-12; 2015 Carefree Screening Report at 24. And the 2015 investigation, unlike the 2013 investigation, was initiated based an external tip reported to State Farm by the NICB.[1] Upon receiving the 2015 NICB tip, State Farm had the hindsight of its previous investigation into Carefree. One could fairly expect a more diligent investigation the second time around. Reasonable people could reach divergent conclusions about whether the intervening evidence between 2013 and 2015 changed the calculus enough to put State Farm on inquiry notice where it was not before.

Carefree argues that *GO Computer, Inc. v. Microsoft Corp.* demonstrates that State Farm was on inquiry notice as of the 2013 investigation, because the discovery rule does not toll the statute of limitations until the "dawn of complete awareness." 508 F.3d 170, 179 (4th Cir. 2007) (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)). Notwithstanding the fact that *GO Computer* dealt with fraudulent concealment in the federal common law and not Maryland's discovery rule, 508 F.3d at 177-78, a distinction the court has pointed out before, *Carefree III*, 2020 WL 5526585, at *4 n.5, the Fourth Circuit cautioned that "[w]e must tread cautiously" in starting the statute of limitations clock, or else "too sensitive a trigger will have parties rushing to the courthouse at the first hint of suspicion to avoid having their claims go stale." *Id.* at 178. In *GO Computer*, the plaintiff twice met with the Federal Trade Commission ("FTC")

---

[1] The discovery rule tolls the statute of limitations "until a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further. In other words, the beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the follow-up investigation." *Pennwalt Corp.*, 314 Md. at 447 (citing *O'Hara*, 305 Md. at 288-89). But even assuming the date of the NICB tip was the point at which State Farm was on notice, State Farm's complaint is timely: the NICB tip appears to have been received around early July of 2015, within three years of May 1, 2018. Email from P. Riffe re: NICB Tip, ECF 121-24 (sent on July 9, 2015).

as part of an investigation into Microsoft during which an FTC investigator stated "'[t]his looks like a textbook case of abuse of monopoly power,'" he made several written statements about Microsoft's licensing arrangements, wrote a book in which he described Microsoft's licensing practices, and discussed litigation with a law firm. *Id.* at 178. It was "the multiplicity and specificity of the information he had" that put the plaintiff on inquiry notice. *Id.* at 179. Though State Farm undoubtedly had some evidence of potential fraud resulting from protocol treatment, the court cannot conclude that "information was sufficient, as a matter of law, to spur a reasonably diligent person" to conduct a more searching investigation than State Farm actually did. *Id.* at 178.

Construing the evidence in the light most favorable to State Farm and drawing all reasonable inferences in its favor, the court finds that there is room for reasonable disagreement as to whether, based on the evidence available in 2013, State Farm should have conducted a more searching inquiry into potentially fraudulent claims submitted by Carefree. If a factfinder determines that State Farm was not on inquiry notice until the 2015 investigation, then its claims predating that investigation are timely. Summary judgment is therefore inappropriate on the statute of limitations issue as to all claims. Because summary judgment on the statute of limitations is denied based on the discovery rule, the court does not consider the doctrine of fraudulent concealment.

### III. Voluntary Payment Doctrine

Carefree argues that State Farm cannot recover for any payments it made due to the application of the voluntary payment doctrine. According to Carefree, "State Farm was clearly aware of every fact it alleges about Defendants' records long before May 1, 2015, but unquestionably the very latest date it can claim to have been unaware of the facts is March 30, 2016." Mot. at 31. State Farm responds that the voluntary payment doctrine does not apply in this

19

case because it only applies to mistakes of law, not fact. Opp'n at 29-30.

Carefree correctly states the law: "[u]nder the common law voluntary payment doctrine, where money is voluntarily and fairly paid, with a full knowledge of the facts and circumstances under which it is demanded, it cannot be recovered back in a court of law." *Baxter v. AmeriHome Mortg. Co., LLC*, 617 F. Supp. 3d 346, 353 (D. Md. 2022) (quoting *Whitehall Mill v. Mayor & City Council of Baltimore*, No. 3337, 2020 WL 6253539, at *6 (Md. Ct. Spec. App. Oct. 23, 2020)). But, because State Farm's claims are predicated on fraud, this is not a case for the voluntary payment doctrine. A claim for recovery based on allegations of fraud necessarily involves a lack of complete knowledge of the facts. *See Brutus 360, LLC v. Town of Bel Air*, 448 Md. 355, 361-62 (2016) ("The courts have recognized some common law exceptions to the voluntary payment doctrine. Chief among the exceptions are cases involving payments made as a result of fraud, mistake of fact, or duress."). Before it determined that Carefree was submitting fraudulent claims, State Farm simply could not have had full knowledge of the facts. And Carefree's argument that State Farm knew the facts as of March 30, 2016, is irrelevant: the final paid claim described by State Farm's complaint was for a visit two weeks earlier, on March 14, 2016. *See* Claims Chart at 12, ECF 52-4. The voluntary payment doctrine therefore does not bar State Farm's recovery in this case, and summary judgment on that issue is denied.

## IV. Sufficiency of the Evidence

Carefree argues that the evidence is insufficient to support a finding of fraud as to "any one patient." Mot. at 35. It bases its argument on the fact that State Farm's expert, Dr. Michael Schneider, focused his analysis on patterns across Carefree's treatment of patients and not "whether the treatment provided to any one patient was reasonable and necessary." *Id.* State Farm

responds by identifying statements by Dr. Schneider that he would be willing to testify that it was

his opinion that fraud occurred in several individual claims based on their similarity to the overall

pattern that he describes. Opp'n at 31-33 (quoting M. Schneider Dep. at 108:12-112:20, ECF 121-

6 ("Schneider Dep.")).

From the record, viewing the evidence in the light most favorable to State Farm, there is

evidence from which a reasonable jury could conclude that individual claims were fraudulent. To

recover in an action for fraud, the plaintiff must prove: "(1) that the defendant made a false

representation to the plaintiff, (2) that its falsity was either known to the defendant or that the

representation was made with reckless indifference as to its truth, (3) that the misrepresentation

was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the

misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable

injury resulting from the misrepresentation." *Moscarillo v. Pro. Risk Mgmt. Servs., Inc.*, 398 Md.

529, 544 (2007) (quoting *Nails v. S & R*, 334 Md. 398, 415-16 (1994)). In his deposition, Dr.

Schneider stated that "pretty much any one of these [claims] you would pick out I'd feel relatively

comfortable testifying that fraud was committed" "[b]ecause of the inconsistencies and in some

cases incredible or almost impossible findings that make no sense. They rise to the occasion of

being that the[y're] fabricated and I can't believe the notes." Schneider Dep. at 113:7-9, 113:11-

14. This testimony, if believed and combined with other evidence, such as records of Carefree's

above-average billing, could support a finding of fraud, and summary judgment is therefore

inappropriate.

## V. Declaratory Judgment Count

Carefree next contends that State Farm has not produced any evidence to support its

declaratory judgment count regarding claims for which it has not yet issued payment. Mot. at 31-

33. The declaratory judgment count specifically seeks relief as to "any outstanding or unpaid claims for payment based on any Chiropractic Records submitted prior to the commencement of this action" and "any Chiropractic Records submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations." Am. Compl. ¶ 91. State Farm argues that the evidence supporting its fraud claims also supports finding fraud as to the pending claims. Opp'n at 33-34. In its Reply, Carefree further takes issue with State Farm's references to claims that were not specifically enumerated in State Farm's amended complaint, including claims that post-date March 14, 2016 (the date of the last claim in State Farm's Claims Chart) and argues that "Exhibit A to the Amended Complaint is the <u>entire</u> universe of underlying claims." Reply at 1. State Farm moved to file a sur-reply, Mot. to File Sur-Reply, ECF 129-1, and in the proposed sur-reply argues that the Claims Chart is simply a "representative example" of the claims at issue in its complaint. Sur-Reply at 1-2. Further, State Farm points out that part of its declaratory judgment count specifically relates to "Chiropractic Records submitted subsequent to the filing of this action." *Id.* at 2 (citing Am. Compl. ¶ 91(ii)).[2]

State Farm's declaratory judgment count is valid and sufficiently supported by the evidence. Other courts have declined to dismiss counts seeking a declaratory judgment that an insurer need not reimburse a healthcare provider for any pending claims submitted during the litigation that it can prove are fraudulent. *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 561-62 (D. Md. 2019); *State Farm Mut. Auto. Ins. Co. v. Pointe Physical*

---

[2] State Farm argues that Carefree waived these arguments by not raising the issue in its opening brief. Sur-Reply at 3-4. While that is generally the law, *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006), State Farm filed a sur-reply asserting its counterarguments, which the court will accept and consider. The concerns underlying the prohibition on asserting new arguments in a reply are therefore assuaged. *Id.* at 734-35.

*Therapy*, 68 F. Supp. 3d 744, 755-58 (E.D. Mich. 2014). Those courts determined that the declaratory judgment counts were sufficiently particular as to pending claims because the complaints "provided the defendants with 'the particular circumstances for which [they] will have to prepare a defense at trial' and [] provided 'substantial prediscovery evidence' [of fraud]." *Slade*, 381 F. Supp. 3d at 564.[3] The claims at issue in the declaratory judgment count are sufficiently identified in this case as well.[4] State Farm's complaint states that it seeks declaratory judgment as to "any outstanding or unpaid claims for payment based on any Chiropractic Records submitted prior to the commencement of this action" and "any Chiropractic Records submitted subsequent to the filing of this action which include false, misleading, inaccurate, and/or fraudulent statements and representations." Am. Compl. ¶ 91. And the theory of fraud supporting these claims is the same as the claims involved in State Farm's fraud and unjust enrichment counts, namely, protocol treatment. *See id.* The expert testimony State Farm plans to use to show protocol treatment in the individual records enumerated in the Claims Chart is equally applicable to pending unpaid claims, insofar as Dr. Schneider will testify under oath that those pending claims are fraudulent because they match the pattern which demonstrates fraud in the enumerated claims.

Moreover, the record reflects that State Farm has produced records as to those claims involved in the declaratory judgment count. *See* Pending Claims Production List, ECF 128-1; Sur-Reply at 3. Additional discovery is therefore unnecessary. To the extent that State Farm decides to withhold payment for any new claims that it determines are fraudulent and seeks to include them

---

[3] Additionally, the court is persuaded by the consideration that resolving all of the past and pending allegedly fraudulent claims in a single litigation is in the interest of judicial economy. *See Pointe*, 68 F. Supp. 3d at 759.

[4] The court has not ruled that State Farm's claims are limited to those enumerated in the Claims Chart. *See Carefree II*, 2019 WL 4722675, at *5.

in its declaratory judgment count, it has a continuing obligation to identify those claims to Carefree

and produce relevant documents, if any. State Farm's declaratory judgment count is valid and

includes unpaid claims submitted before and during the conduct of this litigation for which State

Farm sufficiently proves fraud at trial.

## CONCLUSION

For the reasons stated above, Carefree's motion for summary judgment will be **DENIED.**

State Farm's motion to file a sur-reply will be **GRANTED**.

A separate order follows.


| 9/27/2023 | | /s/ |
|---|---|---|
| Date | | Catherine C. Blake |
| | | United States District Judge |